359 F.Supp. 1147 (1973)
Henry M. PHILLIPS, Plaintiff,
v.
UNITY WELFARE ASSOCIATION, INC., a corporation, et al., Defendants.
No. 71 C 8 (2).
United States District Court, E. D. Missouri, E. D.
April 30, 1973.
*1148 Richard F. Moll and Walter T. Timm, Barnard, Timm & McDaniel, St. Louis, Mo., for plaintiff.
Merle L. Silverstein, Rosenblum & Goldenhersh, Clayton, Mo., for Unity Welfare Assn., Inc., Charles J. Morse, Herman A. Lueking, Jr., and Roy L. Williams.
Mortimer A. Rosecan, Rosecan & Popkin, St. Louis, Mo., for Local Union No. 688.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
In this action removed from the Circuit Court of the City of St. Louis, plaintiff claims entitlement in Count One of his complaint to pension benefits under the Central States, Southeast and Southwest Areas Pension Plan, a pension plan within the meaning of the Welfare and Pension Plans Disclosure Act, 29 U.S.C., Chapter 10.
By agreement of the parties the following pretrial order was entered:
"That plaintiff having demonstrated sufficient past covered employment to qualify for pension benefits, if his employment at McQuay-Norris should be credited as years of covered employment, it is ordered that the trial of Count One, with respect to plaintiff's claim for pension benefits, be limited to the sole issue of whether plaintiff's employment during two periods at McQuay-Norris constituted `covered employment' as that term was used in the Central States Southeast and Southwest Areas Pension Plan, at the time of plaintiff's filing his application for pension. If the Court resolves this issue in the affirmative, plaintiff shall receive pension benefits as set forth in said plan; if the Court resolves this issue in the negative, plaintiff shall not receive pension benefits under Count One."
At the time of his retirement on June 14, 1968, plaintiff was an employee of Cole Pharmacal Company and had been such since November 12, 1959. Cole became party to a teamster contract in April, 1965, at which time plaintiff became a member of the Teamsters Union, Local 688. Cole became a contributing employer to the pension trust fund on October 16, 1966, so that under the terms of the plan, October 16, 1966 is the "Effective Date."
The pension plan which was in effect as of the date of plaintiff's retirement (Green Book) defines "Covered employment prior to the Effective Date" to mean, to the extent here relevant, "employment in the industry as defined in a collective bargaining agreement." Hence, as stated in the pre-trial order, the issue is whether the periods of time plaintiff was employed at McQuay-Norris Manufacturing Company prior to the Effective Date should be considered "employment in the industry as defined in the collective bargaining agreement."
There were two such periods of employment, the first during World War II and the second during the Korean conflict, in each of which McQuay-Norris manufactured small arm ammunitions in cooperation with another contractor under contract with Army Ordnance, United States Defense, in the Small Arms complex in St. Louis. During each of these operations plaintiff was employed as a production worker, first from November, 1941 through August, 1945, and later from August, 1951 to September, 1956. During the Korean War, plaintiff was a member of the Machinists' Union which had a collective bargaining agreement covering employees at the installation.
During his two McQuay-Norris employments plaintiff helped ready the plant for production, setting up and installing production machinery, and then working on the production line as a tool maker, tool grinder and machine operator. When the facility was shut down, plaintiff helped move machinery in connection with a "mothballing" process. As part of his set-up and mothball work plaintiff operated a forklift. There is also evidence that plaintiff operated a forklift a portion of the time of his employment in helping move steel into the plant, but in our judgment this work did *1149 not occupy a substantial portion of his time. There were no warehouse or loading operations at the McQuay-Norris facility, and there was no forklift work as that term is usually applied to warehousemen and dockmen.
For a number of years (since the inception of the Plan) the trustees have uniformly and consistently interpreted and applied the term "covered employment" with respect to service prior to the Effective Date as excluding jobs which were either not in the traditional teamster crafts, such as drivers, warehousemen, dockmen, mechanics and service station operators, or which were not usually covered by teamster contracts in the particular geographic area at the time the work was performed.
In our judgment, the phrase "employment in the industry as defined in a collective bargaining agreement" is ambiguous both as concerns the word "industry" and as to the phrase "a collective bargaining agreement." Obviously, the term "industry" can mean only the teamster industry. This is made crystal clear by the numerous references to "industry" in the Green Book, where in each instance it is referred to expressly or by clear implication as the "teamster industry." For example, in speaking of "Past Service" the booklet states, "You will receive credit for years of service which you have accumulated in the Teamster industry as an employee before you became a member of the Plan."
The work performed by plaintiff during his two periods of employment at McQuay-Norris was not work in any traditional teamster craft. Plaintiff's belated emphasis upon the alleged extent of his forklift operations while employed at McQuay-Norris is, we believe, a result of his recognition that forklift operators perform teamster type work, but he overlooks the fact that this is so only in relation to warehousing operations. That the same skill may have been utilized in performing the work does not of itself make such work teamster work. Cf. Brune v. Morse, 8 Cir., 475 F.2d 858, decided March 20, 1973. Even so, we find from the evidence as a whole that the amount of time spent by plaintiff in operating a forklift constituted only a relatively minor portion of his work and was only incidental to his other employment. Of significance is the fact that in originally making his claim to the trustees for pension benefits, plaintiff made no mention of his forklift work but simply described himself as a production worker. It was not until the trial of this case that plaintiff stressed his forklift work.
The phrase "a collective bargaining agreement" is defined in the Plan as meaning "an agreement to which any union as defined herein is a party" (which would include Teamsters Local 688), but this definition does not inform us as to the time or place such collective bargaining agreement must have been in existence.
The parties have stipulated that Teamsters Local 688 had, over a period of years, been a party to collective bargaining agreements with various employers other than those in traditional teamster crafts. Of these agreements none was in effect during plaintiff's World War II work, and only two of them were in effect during the period of his 1951-1956 McQuay-Norris employment. These later contracts recognize Local 688 as the bargaining agent for production and maintenance employees of the respective employers and therein set forth certain job classifications, such as electrical workers, truck drivers, forklift operators, maintenance and upkeep men, loaders and unloaders.
It is plaintiff's theory that because these isolated collective bargaining contracts, particularly those entered into after June, 1968, were entered into with employers engaged in industrial activities which go far beyond the traditional teamster crafts and cover jobs and classifications similar to those of plaintiff when he had been employed at McQuay-Norris, such job descriptions and classifications necessarily are "the industry as defined in a collective bargaining agreement." We do not agree.
*1150 So far as concerns the first period of plaintiff's McQuay-Norris employment, there is, as we have stated, no evidence that any collective bargaining agreements were then in existence which covered any job descriptions and classifications such as performed by plaintiff. We do not believe the Plan contemplated that work which could not have constituted "covered employment" when performed should be retroactively transferred into such simply because of the fortuitous circumstance that many years later a local union organizing non-traditional industries entered into a collective bargaining agreement with another employer covering such types of work.
The trustees did not abuse their discretion in reasonably interpreting the Plan as requiring that the collective bargaining agreements referred to therein must have been in existence at the time the work in question was performed by a pension claimant. The record shows that the trustees have uniformly denied credit for time in which a claimant was employed as a tool maker or production worker, so that plaintiff was treated in the same manner as all others who made claims to pension benefits. Cf. Brune v. Morse, supra, which we believe sustains the right of the trustees to interpret ambiguous language of the Plan consistently with its purpose. It is true that the Brune case involved the construction of the amended pension Plan (the Brown Book), but in our judgment, insofar as concerns an employee entering the plan prior to the date of the Brown Book (May 31, 1973), the amended plan simply codified the uniform rule of administration which the trustees had consistently followed for many years.
Although the trustees' interpretation of the rule was not formally explicated until the Brown Book was published, we hold that the present rule as applied to those entering the plan prior to May 31, 1971, does not constitute a departure from or an amendment of the former language as it had been consistently interpreted by the trustees. The prime purpose in adopting the Brown Book was simply to limit to five years past service credits for non-traditional teamster work of employees entering the plan after May 31, 1971. We are convinced that but for the desire, if not the actuarial necessity, to limit past service credits for future members, there would have been no Brown Book, and plaintiff's application would have been considered in precisely the same manner. In this situation, it is simply not true, as argued by plaintiff, that the trustees were applying a new rule as set forth in the Brown Book retroactively in order to deny a pension to plaintiff.
Having found that plaintiff's employment during his two periods at McQuay-Norris did not constitute "covered employment," it follows that plaintiff is not entitled to pension benefits under the Plan.
The remaining issue as to Count One concerns the liability, under Section 308, 29 U.S.C., of the trustees as administrators of the pension plan. Section 307 of the Welfare and Pension Plans Disclosure Act provides in part that the administrator of the pension plan shall deliver upon written request to any participant or beneficiary of the plan a copy of the description of the plan and an adequate summary of the latest annual report required by the Act. And Section 308 provides that any administrator of a plan who fails or refuses, upon the written request of a participant or beneficiary covered by such plan, to make publication to him within 30 days of such request, in accordance with the provisions of Section 307, of a description of the plan or an annual report "may in the court's discretion become liable to any such participant or beneficiary making such request in the amount of $50 a day from the date of such failure or refusal." The Court is further authorized "in its discretion, in addition to any judgment awarded to the plaintiff or plaintiffs [to] allow a reasonable attorneys' fee to be paid by the defendant, and costs of the action."
Admittedly, plaintiff through his attorney made a written request that he be sent a copy of a description of the *1151 plan and a summary of the latest annual report of the administrator. This request was addressed, not to the trustees either collectively or by name but to the Central States Southeast and Southwest Pension Fund. It was dated August 8, 1969 and received August 11, 1969 in the office of the Pension Fund. There is no evidence as to when the defendant trustees became personally aware of plaintiff's request. Copies of the pension plan were sent to plaintiff by the office staff under date of September 24, 1969, about two weeks later than 30 days after the request was received at the office. However, the financial statement was not sent until December 3, 1969.
The evidence convinces us that the delays were not willful, but rather were the result of clerical errors by subordinate employees in the office of the trustees of the plan. There is not the slightest evidence that plaintiff was disadvantaged in any way by the clerical errors. As for the financial statement, its absence had no bearing on the processing of plaintiff's claim, and plaintiff has made no showing whatsoever that he was in any way injured by the failure to timely transmit the report or summary thereof to him.
Section 308 provides for a penalty, and penalty statutes are necessarily strictly construed. In this situation, in view of the good faith of the trustees, the complete absence of any injury to plaintiff, and the fact that the request was not addressed to the trustees, the actual administrators of the Plan, and such trustees were not shown to have had any knowledge of the request prior to the time it was complied with, we find, in our discretion, that the trustees should not be penalized for the inadvertent failure of their office employees to timely transmit the requested information.
The foregoing memorandum constitutes our findings of fact and conclusions of law. Judgment should be entered on Count One in favor of defendants.